**In re BUSPIRONE PATENT LITIGATION.**

**In re Buspirone Antitrust Litigation.**

**MDL Docket No. 1410.**

United States District Court, S.D. New York.

Feb. 14, 2002.

Richard J. Stark, Evan R. Chesler, David Russell Marriot, Cravath, Swaine & Moore, New York City, Joshua Ross Diamond, Diamond & Robinson, Montpelier, VT, Matthew J. Becker, Day, Berry & Howard, Hartford, CT, Steven Lieberman, E. Anthony Figg, Elizabeth A. Leff, Mark I. Bowditch, Rothwell, Figg, Ernst & Manbeck, Washington, DC, Gordon H. Copeland, Michael T. Smith, Megan D. Dortenzo, Steptoe & Johnson, Clarksburg, WV, for Plaintiff.

Charles Platto, Norwich, VT, Edgar H. Haug, Barry S. White, Daniel G. Brown, Terri L. Nataline, Frommer, Lawrence & Haug, L.L.P., New York City, Steven David Ecker, Thomas J. Murphy, Cowdery, Ecker & Murphy, Hartford, CT, Walter M. Jones, III, Martin & Seibert, Martinsburg, WV, Elisabeth H. Rose, Rose, Padden & Petty, L.C., Fairmont, WV, Thomas H. Newbraugh, Morgantown, WV, for Defendant.

### Opinion and Order No. 19

KOELTL, District Judge.

(Motion to Dismiss Antitrust and
Related State Law Claims)

On August 15, 2001, the Judicial Panel on Multidistrict Litigation consolidated for pre-trial purposes before this Court four patent disputes, which had been consolidated under MDL–1410, and twenty-two antitrust actions, which had been consolidated under MDL–1413, all of which involve disputes among the various parties over the propriety of the manufacture, use, sale or allegedly anticompetitive conduct related to the use and sale of buspirone,[1] a drug used to treat anxiety. The Panel has also transferred twelve tag-along cases to this Court.

The defendant in the antitrust actions is Bristol–Myers Squibb Company ("Bristol–Myers" or "BMS"), a company that obtained a patent covering the use of buspirone for the treatment of anxiety in 1980 (the "'763 Patent") and that has been selling the product since 1986, when the Food and Drug Administration (the "FDA") approved the drug for human use. The plaintiffs are, variously, generic drug makers who seek or have sought to enter the buspirone market, direct purchasers of buspirone products, end-payors who have purchased buspirone, consumer protection organizations, or their representatives, and

---

**1.** Buspirone hydrochloride is a pharmaceutically acceptable acid addition salt of buspirone. The distinction between buspirone and buspirone hydrochloride is not relevant to the legal issues in this motion, and the term "buspirone" will be used to refer to either or both in this opinion.

thirty States. These plaintiffs (the "antitrust plaintiffs") have consolidated their claims into six Amended Complaints or Pleadings (the "Complaints").

The Complaints assert a number of claims, all of which arise out of two separate sets of circumstances. First, some of the plaintiffs allege that Bristol–Myers attempted to extend and/or extended an unlawful monopoly over buspirone products for use in the treatment of anxiety, and also entered into a conspiracy to restrain trade in this market, thereby violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, by settling a patent infringement suit with Danbury Pharmacal, Inc. and its affiliate Schein Pharmaceuticals, Inc. ("Schein") in 1994. In that litigation, Bristol–Myers had argued that Schein would infringe the '763 Patent by manufacturing and selling generic buspirone tablets before the '763 Patent expired. The plaintiffs who raise these claims allege that Bristol–Myers's settlement was a sham used to cover up an unlawful anticompetitive arrangement under which Schein agreed to stay out of the buspirone market and help maintain a public perception that the '763 Patent was valid in return for $72.5 million, even though both parties knew that the '763 Patent was not valid (the "Schein Settlement activities").[2]

Second, all of the Complaints allege that Bristol–Myers attempted to extend and/or extended an unlawful monopoly over the market in buspirone tablets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by abusing a number of provisions of the Hatch–Waxman Amendments, also known as the Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271(e)), which amended the Federal Food, Drug, and Cosmetic Act ("FDCA"), Pub.L. No. 52–675, 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. §§ 301–397). The antitrust plaintiffs argue that Bristol–Myers thereby prevented the FDA from approving generic buspirone products that competitors sought to market after the '763 Patent expired. The Complaints allege, in particular, that Bristol–Myers (i) listed a newly-obtained patent (the "'365 Patent") in an FDA publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations," or the "Orange Book," on November 21, 2000, less than one day before the '763 Patent expired; (ii) fraudulently represented to the FDA in these listing submissions that the new '365 Patent covered uses of buspirone and that a reasonable claim of patent infringement could be asserted against generic producers of the drug, when Bristol–Myers knew these uses of buspirone clearly would be in the public domain after the '763 Patent expired; and then (iii) immediately brought patent infringement suits against generic competitors who were seeking to enter the buspirone market, thereby triggering an automatic stay of the FDA's approval of these generic products for up to thirty months under the Hatch–Waxman Amendments, specifically, 21 U.S.C. § 355(j)(5)(B)(iii). The End–Payor plain-

2. The thirty States are not parties to this motion with regard to the Schein Settlement activities. The States' original Complaint did not state any claims related to these activities, and, when this motion to dismiss was filed, the States had not yet decided whether to amend their Complaint to add such claims. On February 1, 2002, the States filed an Amended Complaint that included allegations concerning the Schein Settlement activities, but those allegations have not yet been the subject of a motion. The States have, however, submitted a brief concerning the *Noerr–Pennington* issue discussed below and have agreed to be bound by this Court's current decision relating to that issue.

tiffs, Mylan, Watson and the thirty States raise analogous state law causes of action for antitrust, unfair competition or unfair or deceptive trade practices, and/or unjust enrichment arising out of those same facts and circumstances (the "'365 Patent activities").

Bristol–Myers moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss all of the claims raised by the antitrust plaintiffs in the antitrust actions (collectively, the "antitrust claims").

## I.

When considering a motion to dismiss, the Court " 'must accept the material facts alleged in the complaint[s] as true and construe all reasonable inferences in the plaintiff[s'] favor.' " *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995) (considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)) (quoting *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.1994)). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint[s] [themselves are] legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, Bristol–Myers's present motion should only be granted if it appears that the antitrust plaintiffs can prove no set of facts in support of their respective claims that would entitle them to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998); *see also Goldman*, 754 F.2d at 1065.

In deciding the motion, the Court may consider documents referenced in the Complaints and documents that are in the relevant antitrust plaintiffs' possession or that they knew of and relied on in bringing suit. *See Brass v. American Film Tech-*

*nologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991); *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991); *Skeete v. IVF America, Inc.*, 972 F.Supp. 206, 208 (S.D.N.Y.1997). The Court may also consider "matters of which judicial notice may be taken." *See Leonard F. v. Israel Discount Bank*, 199 F.3d 99, 107 (2d Cir.1999) (quotation omitted); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir.1991). However, "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (quoting *Poller v. Columbia Broad.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)).

The Court has already set forth a number of relevant facts that are either undisputed or are matters of public record in a companion Opinion, issued today, which decides the motion for summary judgment filed by Danbury Pharmacal, Inc. and Watson Pharmaceuticals, Inc. (collectively "Watson") and Mylan Pharmaceuticals, Inc., Mylan Laboratories Inc. and Mylan Technologies Inc. (collectively "Mylan") in the patent infringement cases. *See In re Buspirone*, MDL No. 1410, slip op. at 6–26 (S.D.N.Y. Feb. 14, 2002) (Order No. 18) (Motion for Summary Judgment on Patent Infringement Claims). Familiarity with those factual recitations is assumed.

## II.

Bristol–Myers moves to dismiss all of the federal and state antitrust claims based on Bristol–Myers's conduct in listing the '365 Patent in the Orange Book and then bringing its subsequent patent in-

fringement suits against Mylan and Watson. As a basis for this motion, Bristol–Myers cites the *Noerr–Pennington* doctrine, which was articulated in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

In *Noerr*, the Supreme Court held that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr*, 365 U.S. at 136, 81 S.Ct. 523. Noting that the First Amendment to the United States Constitution grants citizens the fundamental right to petition the government with their views and wishes, the Court held that the Sherman Act should not be read in a way that might vitiate these rights by allowing for retaliatory antitrust lawsuits in response to the kinds of "political activity" through which "the people ... freely inform the government of their wishes." *Id.* at 137, 81 S.Ct. 523; *see also id.* at 138, 81 S.Ct. 523. Noting that such expressions also provide the government with valuable sources of information in a democratic society, the Supreme Court held as a matter of statutory interpretation that petitioning activity of this kind is generally immune from suit under the Sherman Act. *See id; see also Pennington*, 381 U.S. at 670, 85 S.Ct. 1585 ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.").

However, the Supreme Court also carved out a limited exception to this rule for so-called "sham" petitioning. *See id.* at 144, 81 S.Ct. 523. It concluded that "application of the Sherman Act would [still] be justified" if petitioning activity that is "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor...." *Id.; see also California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) ("First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' ... which the legislature has the power to control.").

In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. at 508, 92 S.Ct. 609, the Supreme Court clarified that the *Noerr–Pennington* doctrine extends to petitioning activity before "administrative agencies ... and ... courts." *Id.* at 510–11, 92 S.Ct. 609. In this context, there is also a limited exception to *Noerr–Pennington* immunity for so-called "sham" litigation, which is litigation that meets the following two criteria: (i) "the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and (ii) the "baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Professional Real Estate Inv's, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) [hereinafter "*PRE*"] (internal citations omitted).

Moreover, there are some circumstances in which there is an additional exception to *Noerr–Pennington* immunity for conduct in which a party knowingly and willfully makes false representations to the government. For example, in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Supreme Court held that a party that had monopolized a

market through threats of suit and through a subsequent patent infringement suit based on a patent that the party had obtained by making fraudulent representations to the Patent Office did not qualify for *Noerr–Pennington* immunity. *See id.* at 174–78, 86 S.Ct. 347. In circumstances where the *Walker Process* exception applies, the Court of Appeals for the Federal Circuit has made it clear that the *Walker Process* exception co-exists with the sham litigation exception under *PRE* and that either exception will strip a patent holder of *Noerr–Pennington* immunity. *See, e.g., In re Independent Serv. Org. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed.Cir.2000); *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343 (Fed.Cir.1999); *Nobelpharma A.B. v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed.Cir.1998) (holding, in addition, in a limited in banc ruling, that it is a question of Federal Circuit law whether the fraudulent procurement of a patent and its subsequent use to generate anticompetitive injuries through suits and threats of suit are sufficient to strip a patentee of *Noerr–Pennington* immunity).

■ Hence, under current Federal Circuit law, a patent holder who seeks to enforce a patent through litigation can lose *Noerr–Pennington* immunity in two ways: first, if the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process*, and if the plaintiff in the patent infringement suit was aware of the fraud when bringing suit; or second, if the patent infringement suit was a mere sham within the meaning of *PRE*, namely that it was objectively baseless and subjectively motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal

remedy. *See Nobelpharma,* 141 F.3d at 1068, 1071.

Bristol–Myers argues that all of its conduct in listing the '365 Patent in the Orange Book and bringing its subsequent patent infringement suits against Mylan and Watson is immunized from federal antitrust liability under these *Noerr–Pennington* standards. Bristol–Myers argues, in particular, that its conduct is immunized unless it was objectively baseless, and that its conduct was not objectively baseless. Bristol–Myers argues, in addition, that the *Noerr–Pennington* doctrine applies to the analogous state law claims raised by the antitrust plaintiffs arising out of the '365 Patent activities, and that these claims should be dismissed for the same reasons.

### A.

■ The first issue is whether the *Noerr–Pennington* doctrine applies to Bristol–Myers's conduct in listing the '365 Patent in the Orange Book. This issue depends on whether this conduct was petitioning activity for *Noerr–Pennington* purposes.

Bristol–Myers argues that its listing meets this criterion because it was a request for governmental action, specifically, for the FDA to publish the information submitted to it in the Orange Book. However, in deciding whether a particular type of conduct is petitioning activity for *Noerr–Pennington* purposes, it is critical to distinguish between activities in which the government acts or renders a decision only after an independent review of the merits of a petition and activities in which the government acts in a merely ministerial or non-discretionary capacity in direct reliance on the representations made by private parties.[3] One of the reasons for

---

**3.** The parties point to places in the record where their adversary or adversaries have taken positions on whether the FDA's role in the process of listing a patent in the Orange Book is purely ministerial that are inconsistent with positions they take before this Court.

extending *Noerr–Pennington* immunity to acts through which private parties seek to influence governmental decisions in the first class of cases is that these private parties can often only obtain the anticompetitive effects in question by first convincing the government of the merits of their views and by obtaining a valid and independent governmental decision, which intervenes between the private parties' actions and these anticompetitive results. *See Noerr*, 365 U.S. at 136–37, 81 S.Ct. 523. Another reason is that it would raise important First Amendment concerns if citizens affected by these kinds of governmental decisions were unable freely to inform the government as to their views and wishes concerning what the government should decide. *See id.* at 137–38, 81 S.Ct. 523. Hence, conduct aimed at persuading the government of a position or expressing views in these kinds of circumstances is generally considered petitioning activity for *Noerr–Pennington* purposes and is immunized.

For the same reasons, however, the *Noerr–Pennington* doctrine is not applicable to conduct through which private parties seek to achieve anticompetitive aims by making representations to the government in circumstances where the government does not perform any independent review of the validity of the statements, does not make or issue any intervening judgment and instead acts in direct reliance on the private party's representations. For example, in *Litton Systems, Inc. v. AT & T Co.*, 700 F.2d 785 (2d Cir.1983), the Court of Appeals for the Second Circuit held that AT & T's filing of an interface tariff with the Federal Communications Commission ("FCC"), which required telephone customers to connect equipment purchased from AT & T's competitors to the telephone system only through the use of a device designed by AT & T, was not petitioning activity for *Noerr–Pennington* purposes. *See id.* at 794–95, 806–09. This was true even though AT & T was required by law to file its tariff with the FCC in order for the tariff to take effect. *See id.* at 795. The FCC did not review the legality of the tariff immediately. Rather, the FCC allowed the tariff to take effect, explaining that its action was not to be construed as "giving any specific approval to the ... tariffs." *Id.; see also id.* at 798 n. 12. Almost ten years later, after conducting extensive hearings into the legality of the tariff, the FCC found that the tariff had

---

In particular, Bristol–Myers took the position before the FDA, and before the District Court in Maryland, *see Watson Pharm., Inc. v. Henney*, Civ. No. S 00–3516, 2001 U.S. Dist. LEXIS 2477 (D.Md. Jan. 17, 2001), that the FDA's role in the process of listing a patent in the Orange Book is purely ministerial. It now takes the position that the FDA exercises some discretion and performs some review of the information and, therefore, that its activity before the FDA was "petitioning" activity. Mylan has recently taken the position before the District Court for the District of Columbia that the FDA has a positive obligation to review the merits of listing submissions, *see* Mylan's Proposed Second Am. Compl. ¶ 38 in *Mylan Pharm., Inc. v. Thompson*, Civ. A. No. 00 CV 02876 (D.D.C.) (signed Jan. 16, 2002), and Mylan has tried to convince the FDA that it has the authority to delist a patent that is improperly listed. Mylan and Watson take the position in this motion that the FDA's role in the process of listing a patent in the Orange Book is purely ministerial.

Bristol–Myers's inconsistencies are somewhat more damaging to its position because the District Court in the District of Maryland accepted the proposition that the FDA's actions were ministerial and dismissed Watson's action seeking an injunction against the FDA Commissioner to delist Bristol Myers's '365 Patent on that basis. In any event, as set forth below, this Court has independently examined the legal positions of the parties and has made an independent determination of the correct legal status of the FDA's actions.

been invalid all along and set it aside. *See id.* at 796–99.

*Noerr–Pennington* immunity did not apply to the tariff filing because this conduct was not akin to the petitioning activity held protected in *Noerr* and *Pennington. See id.* at 807. In particular, AT & T was able to extend its monopoly over the telephone equipment market simply by filing the tariff, and without first obtaining any FCC determination as to the legal validity of the tariff. *See id.* at 795. The Court of Appeals concluded that "AT & T's power to exclude ... competitors from the telephone terminal equipment market resulted not from the FCC's regulatory authority but from AT & T's exclusive control of the telephone network." *Id.* at 807. The Court of Appeals explained, further, that "the FCC's failure to strike down a tariff at the time of its filing does not make the conduct lawful, particularly where ... the agency specifically declines to rule on a tariff's legality." *Id.* at 808. Hence, the Court of Appeals held that *Noerr–Pennington* immunity did not apply to the act of filing the initial tariff. *See id.; see also Ticor Title Ins. Co. v. FTC,* 998 F.2d 1129, 1138 (3d Cir.1993) (collective rate filing is not a petition); *City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173, 1181 (8th Cir. 1982) (utility rate filing is not a petition).

For many of the same reasons that tariff filings are not acts of petitioning, Bristol–Myers's activities in listing the '365 Patent in the Orange Book are not acts of petitioning. Pioneer drug companies are required by law to submit in their NDAs information regarding any patent that "claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the

drug." 21 U.S.C. § 355(b)(1). Moreover, 21 U.S.C. § 355(c)(2) states that "if the holder of an approved application could not file patent information [in its NDA application] because no patent had been issued when an application was filed or approved, the holder shall file such information under this subsection not later than thirty days after the date the patent involved is issued." In either case, however, the FDA is required by law to publish the information in the Orange Book. *See* 21 U.S.C. §§ 355(b)(1) & (c)(2) ("Upon submission of patent information under [these] subsection[s], the Secretary shall publish it."). Hence, the FDA's actions are non-discretionary and do not reflect any decision as to the validity of the representations in an Orange Book listing. *See, e.g., American Biosci., Inc. v. Thompson,* 269 F.3d 1077, 1084 (D.C.Cir.2001) ("[The FDA] administers the Hatch–Waxman Amendments in a ministerial fashion simply following the intent of the parties that list patents."); *Watson Pharm., Inc. v. Henney,* Civ. No. S 00–3516, 2001 U.S. Dist. LEXIS 2477, at *7–8 (D.Md. Jan. 17, 2001) ("[I]t is paramount to keep in mind that the FDA, in deciding to make an Orange Book listing, is not acting as a patent tribunal. It has no expertise—much less any statutory franchise—to determine matters of substantive patent law. In making its decision to list a patent, therefore, it is entirely appropriate and reasonable for the FDA to rely on the patentee's declaration as to the coverage...."); *Mylan Pharm., Inc. v. Thompson,* 139 F.Supp.2d 1, 10–11 (D.D.C. 2001) (FDA's role in listing patents is purely ministerial), *rev'd on other grounds,* 268 F.3d 1323 (Fed.Cir.2001).

The FDA does have a limited process for allowing parties to dispute the accuracy or relevance of patent information submitted to the FDA and listed in the Orange Book. *See* 21 C.F.R. § 314.53(f). In particular, a party who questions the accu-

racy or relevance of such information may write to the FDA, and the FDA will request that the applicant confirm the information. *See id.* The FDA asked for such a confirmation and clarification in this case, and Bristol–Myers argues that this process is evidence that the FDA engaged in substantive review of the information. However, in these circumstances, the FDA regulations are clear that "[u]nless the application holder withdraws or amends its patent information in response to FDA's request [for confirmation or clarification], the agency will not change the patent information in the list"; and that hence, an ANDA applicant must still make certifications for each listed patent, "despite any disagreement as to the correctness of the patent information." *Id.; see also Mylan v. Thompson*, 268 F.3d 1323, 1327 (Fed. Cir.2001). Thus, listing is much more like the filing of a tariff than the kind of conduct through which private parties seek to influence governmental decision making and that has traditionally been immunized under the *Noerr–Pennington* doctrine.

Bristol–Myers argues that its listing of the '365 Patent is nevertheless entitled to *Noerr–Pennington* protection because it was inextricably bound up with its subsequent patent infringement suits, which, Bristol–Myers argues, are paradigmatic instances of petitioning activity. *Noerr–Pennington* immunity sometimes extends not only to litigation but also to certain actions, such as pre-litigation "threat letters," taken incident to litigation. *See, e.g., Primetime 24 Joint Venture v. NBC, Inc.*, 219 F.3d 92, 100 (2d Cir.2000) (collecting cases).

Bristol Myers's listing activity was, however, distinct from its subsequent litigation both analytically and as a practical matter. Bristol–Myers could have listed the '365 Patent in the Orange Book without subsequently bringing infringement suits

against Mylan and Watson, and Bristol–Myers could have brought these suits without relying on its Orange Book listing. What listing does is simply provide the owner of a patent with a number of additional and automatic benefits under the Hatch–Waxman Amendments. For example, by listing a patent that allegedly covers a listed drug or a method of using a listed drug, a pioneer drug company obtains (i) the right to receive notice of any ANDA from applicants seeking FDA approval of a generic form of the drug who have filed a Paragraph IV certification with regard to the patent in question; (ii) a grace period of forty-five days in which to bring a patent infringement suit against any such applicant before the applicant can file a declaratory judgment action; and (iii) if the pioneer drug company brings such a lawsuit, a stay of up to thirty months of the FDA's approval of the ANDA. *See Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 677–78, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990); *see also* 21 U.S.C. § 355(j)(5)(B)(iii). This stay is unmediated by any independent FDA decision as to the merits of the dispute because the FDA is required by law to stay its approval of a generic drug once the pioneer drug company brings suit on a listed patent. *See* 21 U.S.C. § 355(j)(5)(B)(iii). Although Bristol–Myers would lose these particular benefits by failing to list the '365 Patent, Bristol–Myers could still bring a patent infringement suit against generic competitors. Hence, Bristol–Myers's First Amendment right to petition the courts for an authoritative declaration of its rights, for a preliminary injunction or for any other damages it may sustain as a result of patent infringements by its competitors would not be burdened by not having listed its patent in the Orange Book.

For the foregoing reasons, the *Noerr–Pennington* doctrine does not apply to Bristol–Myers's conduct in submitting in-

formation to the FDA to list the '365 Patent in the Orange Book, conduct which is much closer to the filing of a tariff than to genuine acts of petitioning the government. This conduct is therefore not immune from liability under the Sherman Act.[4]

B.

■ Moreover, even if the *Noerr–Pennington* doctrine were to apply to Bristol–Myers's conduct, Mylan and Watson have pleaded sufficient facts to warrant an exception to immunity under the reasoning set forth in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), which allows for antitrust suits when a party has fraudulently obtained a patent and seeks to maintain a monopoly over a product by bringing patent infringement suits against competitors based on the fraudulently-obtained patent.

In this case, the antitrust plaintiffs do not argue that the '365 Patent was fraudulently obtained. They contend that the Patent Office refused to issue any patent that covered the use of buspirone and that the '365 Patent did not claim the use of buspirone. The antitrust plaintiffs allege that Bristol–Myers nevertheless subsequently engaged in fraud on the FDA by submitting information on the '365 Patent to the FDA and claiming that the Patent covered the approved uses of buspirone, when Bristol–Myers knew that these statements were false. They also claim that Bristol–Myers thereafter pursued patent infringement suits against Mylan and Watson, and obtained an automatic stay of the FDA's approval of their products, with knowledge that the stay was obtained by making false statements to the FDA.

Neither the Supreme Court nor the Court of Appeals for the Federal Circuit has addressed whether the *Walker Process* exception would apply to a fraudulent listing of a patent in the Orange Book along with subsequent lawsuits seeking to exploit the listing for anticompetitive advantage. However, in creating the *Walker Process* doctrine, the Supreme Court explained that a claim alleging an initial fraud on the Patent Office would avoid *Noerr–Pennington* immunity for a number of reasons that are directly applicable to fraudulent listings in the Orange Book. In particular, the Court explained that:

'[a] patent by its very nature is affected with a public interest ... [It] is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.'

*Walker Process*, 382 U.S. at 177, 86 S.Ct. 347 (quoting with approval *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). Because a private party can effectively extend a patent monopoly by listing a patent in the Orange Book and then filing suit against generic competitors in that context, these same considerations apply to this conduct.

Moreover, listing submissions, like patent applications, are not adversarial pro-

---

4. *Noerr–Pennington* immunity may apply to the subsequent patent infringement suits that Bristol–Myers brought, but, for the reasons explained below, the antitrust plaintiffs have pleaded sufficient facts for both the *Walker Process* and the sham litigation exceptions to *Noerr–Pennington* immunity.

ceedings, subject to the same kind of rigorous adversarial testing as in litigation. The FDA is required by law to perform even less independent review of the statements made in a listing submission than the Patent Office performs in the patent application review process, thus making the risks of abuse greater. Hence, even if listing were petitioning, the *Walker Process* exception would apply to Bristol–Myers's alleged conduct in this case. *See Warner–Lambert Co. v. Purepac Pharmaceuticals, Co.*, No. 99–5948, slip op., at 11–13 (D.N.J. Dec. 22, 2000) (holding that fraudulent listing in Orange Book is subject to *Walker Process* exception to *Noerr–Pennington* immunity).

Bristol–Myers argues that the antitrust claims in this case would be dismissible under the *Walker Process* standard because the plaintiffs have only alleged that Bristol–Myers made false statement of law, concerning the scope of the '365 Patent, rather than false statements of fact, in its listing application. Bristol–Myers argues that false statements of law cannot give rise to a claim for a fraudulent listing under *Walker Process*. *See, e.g., Bowman v. City of Indianapolis*, 133 F.3d 513, 518 (7th Cir.1998) (Indiana maintains distinction, which has been criticized, between misrepresentations of law, which are not actionable, and misrepresentations of fact, which are actionable); *Compressed Gas Corp., Inc. v. United States Steel Corp.*, 857 F.2d 346, 350 (6th Cir.1988) (misrepresentations of law are not actionable under Kentucky law). Bristol–Myers emphasizes that the construction of a patent claim is a matter of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

However, statements about the law, including statements about the scope of a patent, can be knowingly false and damaging. While misrepresentations of law do not give rise to a cause of action for fraud in some states and in some circumstances, the relevant question here is whether, under Federal Circuit law, the *Walker Process* standard permits an exception to *Noerr–Pennington* immunity for knowing misrepresentations concerning the scope of a patent in the specific context of a listing submission. The Court of Appeals for the Federal Circuit has not yet decided this issue. The listing process is nevertheless such that misrepresentations as to the scope of a patent can be fraudulent for *Walker Process* purposes. In this case, for example, the prosecution history indicates that Bristol–Myers gave up a claim to the use of buspirone in order to obtain approval of the '365 Patent. Having obtained that approval, Bristol–Myers then turned around and claimed that the Patent covered the use of buspirone. Where, as here, it is alleged that a party with intimate legal knowledge about a patent has made knowingly false statements about its scope to a governmental agency that has neither the authority nor the ability to determine the accuracy of the representations and is instead required by law to rely directly upon them in making publication decisions that can have palpable anticompetitive effects, the *Walker Process* exception applies. *See Warner–Lambert*, slip op. at 13 (allowing *Walker Process* exception based on alleged misrepresentation of scope of a patent); *Abbott Labs. v. Alra Lab., Inc.*, No. 92 C 5806, 1993 WL 293995 (N.D.Ill. Aug. 4, 1993) (allowing claim of fraud based on allegation that party knowingly filed false listing with the FDA concerning coverage of a patent); *cf. also Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 46 (2d Cir.1991) ("Even though fraud is generally confined to situations involving misrepresentations of fact, an expression of an intentionally false opinion

on a matter of law may be actionable [under New York law] where a relationship of trust exists. . . ."); *Moreau v. Oppenheim*, 663 F.2d 1300, 1310 (5th Cir. 1981) (misrepresentations of law between fiduciaries may constitute fraud under Texas law); *Ford Motor Credit Co. v. Milburn*, 615 F.2d 892, 895 (10th Cir.1980) (allowing action for fraud based on misrepresentation of law under Oklahoma law when speaker "has superior means of information, professes a knowledge of the law, and thereby obtains an unconscionable advantage of another who is ignorant and has not been in a situation to become informed" (quotation marks omitted)).

The antitrust plaintiffs allege that Bristol–Myers knew that the '365 Patent did not cover any of the approved uses of buspirone and that no claim of patent infringement could reasonably have been asserted on the basis of the '365 Patent against generic competitors seeking to market the drug for those approved uses. For the reasons discussed below, the plaintiffs are correct that no such reasonable claim could have been asserted. The antitrust plaintiffs allege that Bristol–Myers nevertheless represented to the FDA that the '365 Patent does cover such uses and that a reasonable claim could have been brought, thereby maintaining an illicit monopoly over the market and causing the antitrust plaintiffs damage. These allegations, if proven, would be sufficient to warrant an exception to the *Noerr–Pennington* doctrine.

### C.

■ Finally, even applying the *PRE* standard to the Orange Book listing and the subsequent litigations, the positions that Bristol–Myers has taken with regard to the scope of the '365 Patent and whether Mylan's and Watson's products infringe the patent are objectively baseless. A lawsuit is objectively baseless if "no reasonable litigant could realistically expect success on the merits." *PRE*, 508 U.S. at 60, 113 S.Ct. 1920. Similarly, the Hatch–Waxman Amendments only require the listing of patents that claim a drug (or method of using a drug) *for which a reasonable claim of patent infringement could have been asserted* against unlicensed manufacturers and sellers. *See* 35 U.S.C. §§ 355(b)(1) & 355(c)(2).

The test for objective baselessness is by definition an objective one. *See PRE*, 508 U.S. at 58, 113 S.Ct. 1920 (noting that "the sham exception contains an indispensable objective component").[5] It is not what the parties think of the merits of their positions that matters; it is whether there are, in fact, sufficient objective bases for the positions taken. *See Id.* at 63, 113 S.Ct. 1920 (citing *Director General of Railroads v. Kastenbaum*, 263 U.S. 25, 28, 44 S.Ct. 52, 68 L.Ed. 146 (1923)). At the same time, because the test is an objective one,

---

5. The *PRE* standard also contains a subjective component—in order to be stripped of immunity, a baseless lawsuit must also conceal an attempt to interfere with a competitor's business through the governmental process itself, as opposed to the outcome of the process. *See PRE*, 508 U.S. at 60–61, 113 S.Ct. 1920. Bristol–Myers does not argue that the antitrust plaintiffs have pleaded insufficient facts to allege this subjective element for purposes of this motion to dismiss. In any event, the antitrust plaintiffs allege that Bristol–Myers's purpose in listing the '365 Patent in the Orange Book and then bringing the subsequent patent infringement actions was simply to delay the FDA's approval of Mylan's and Watson's ANDAs for up to thirty months, irrespective of the outcome of the litigations, and knowing that Bristol–Myers's claims lacked merit. These allegations are sufficient to state the second element required for an exception to *Noerr–Pennington* immunity under the *PRE*-standard for purposes of this motion to dismiss.

the answer to this question will not depend on the quality of the lawyering.

For the reasons explained at length in the accompanying Opinion, there was no objective basis for Bristol–Myers to claim that the '365 Patent claimed the use of buspirone, or that the Patent could have been valid if it did. The language of the claim, its specification and the prosecution history all demonstrate beyond all reasonable dispute that the '365 Patent does not cover the use of buspirone. Moreover, a straightforward application of governing patent law provisions establishes that the '365 Patent would have been invalid if it did. Bristol–Myers's creative legal arguments to the contrary cannot breathe life into claims that have no basis.

This is, moreover, not a case in which there are occasional places in which Bristol–Myers has mischaracterized or mistaken the relevant issues or legal standards. It is a case where Bristol–Myers has repeatedly argued for a position that requires establishing a number of claims, each one of which has no basis, and each one of which depends upon reframing or mischaracterizing some critical issue or legal standard for its apparent cogency. *Cf. California Motor Transp.*, 404 U.S. at 513, 92 S.Ct. 609 (objective baselessness can be established by a "pattern of baseless, repetitive claims"). This is also not a case in which Bristol–Myers has been arguing for reasonable extensions or developments of the law. Bristol–Myers has taken the straightforward position that it can, in effect, extend a monopoly and reclaim an invention after the expiration of its patent on the invention, when "[i]t is self-evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152, 109 S.Ct.

971, 103 L.Ed.2d 118 (1989) (quoting with approval *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 185, 16 S.Ct. 1002, 41 L.Ed. 118 (1896)) (quotation marks omitted). The public has already paid for its right to these uses by the grant of a limited patent monopoly to Bristol–Myers, which has expired. *See Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 255, 66 S.Ct. 101, 90 L.Ed. 47 (1945). Bristol–Myers's argument ignores the law and tries to justify taking property that belongs to the public.

In these circumstances, Bristol–Myers's conduct in listing the '365 Patent and bringing the subsequent patent infringement suits was objectively baseless. These facts provide an additional reason to deny Bristol–Myers's motion to dismiss based on the *Noerr–Pennington* doctrine.

### D.

It is unnecessary to decide whether the *Noerr–Pennington* doctrine applies to some or all of the related state law claims arising out Bristol–Myers's listing conduct and subsequent patent infringement suits because, for the reasons discussed above, the *Noerr–Pennington* doctrine does not provide a ground for dismissing any claims based on this conduct. Accordingly, Bristol–Myers's motion to dismiss these claims should also be denied.

### III.

Bristol–Myers argues that all of the claims arising out of the '365 Patent activities should be dismissed because patent owners enjoy a qualified immunity when they act in good faith to protect their patent rights. However, "[t]he protection otherwise afforded by the patent laws to a patentee's conduct in enforcing the patent may be lost if the patentee acts in bad faith." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1343 (Fed.Cir.1999). In this case, as discussed above, the antitrust

plaintiffs allege that Bristol–Myers's conduct in listing the '365 Patent in the Orange Book and bringing the subsequent patent infringement suits against Mylan and Watson was performed in bad faith and with knowledge that the '365 Patent does not cover uses of buspirone. These facts, if proven, would be sufficient to strip Bristol–Myers of any qualified patent immunity.

## IV.

Bristol–Myers argues that the End–Payor plaintiffs lack standing to assert state law antitrust and unfair competition claims against Bristol–Myers on behalf of Buspar® purchasers nationwide because they only allege to have purchased Buspar® in fifteen states. Bristol–Myers argues that these plaintiffs therefore lack standing to raise claims under the laws of the other states, and that this poses an Article III obstacle to this Court's jurisdiction over those claims.

■ However, the parties are currently briefing class certification motions, and these alleged problems of standing will not arise unless class certification is granted. If certification is granted, the proposed class would contain plaintiffs who have personal standing to raise claims under the laws governing purchases in all of the fifty states, and the only relevant question about the named plaintiffs' standing to represent them will be whether the named plaintiffs meet the ordinary criteria for class standing, including whether their claims are typical of those of the class, whether they will adequately represent the interests of the class, and whether there are common legal and/or factual issues that predominate over any differences among the classmembers. *See* Fed. R.Civ.P. 23(a). There is no question that this Court has jurisdiction over each of the lawsuits and that each of the named plain-

tiffs has standing to bring at least some claims. Moreover, when a class action raises common issues of conduct that would establish liability under a number of different States' laws, it is possible for those common issues to predominate and for class certification to be an appropriate mechanism for handling the dispute. *See, e.g., Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 58 (S.D.N.Y.1993) (allowing for nationwide class certification on state law claims when there were issues relating to the defendant's conduct that were common to the class, regardless of the law to be applied); *In re Crazy Eddie Secs. Litig.,* 135 F.R.D. 39, 41 (E.D.N.Y. 1991). In these circumstances, it is appropriate to decide class certification before resolving alleged Article III challenges of the present kind. *See, e.g., Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (holding that class certification issues can be "logically antecedent" to Article III concerns, and are properly treated before Article III standing). *But see In re Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp.2d 1365, 1370–72 (S.D.Fla.2001) (handling Article III challenge prior to class certification question and dismissing some state law claims for lack of standing).

In any event, this challenge is premature. The parties have not yet briefed the choice of law question, which will determine what state laws govern the claims of the various putative classmembers whom the End–Payors seek to represent. Hence, the Court cannot yet determine what differences, if any, there are in the legal standards that will apply to the different plaintiffs' claims nationwide.

## V.

Bristol–Myers argues that all of the antitrust plaintiffs' claims alleging violations of the Sherman Act arising out of its set-

tlement activities with Schein should be dismissed on statute of limitations grounds. A number of the plaintiffs allege that this settlement (the "Settlement Agreement"), which included a confidentiality provision, was a sham to cover up an illicit and secret agreement under which Bristol–Myers paid Schein $72.5 million to stay out of the buspirone market and create a semblance that the '763 Patent was valid, thereby allowing Bristol–Myers to maintain the exclusive power to market buspirone products.

 Section 4B of the Clayton Act provides that claims brought under the antitrust laws "shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Generally, an antitrust cause of action accrues as soon as a defendant's allegedly unlawful act causes injury to a plaintiff's business. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir.1996); *see also Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 342 n. 10 (D.C.Cir.1991) (explaining that antitrust actions accrue at time of injury, not when injury was or should have been discovered). The cause of action that accrues at that time immediately "entitles [the] plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial." *Zenith Radio*, 401 U.S. at 338–39, 91 S.Ct. 795. However, if such future damages were too speculative to have been awarded within the original statute of limitations period, a plaintiff may sue to recover those particular damages, if any, within four years of when the injuries actually occur. *Id.* Moreover, if a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294–96 (2d Cir.1979).

Various antitrust plaintiffs in this case allege injuries arising out of Bristol–Myers's settlement with Schein, which allegedly prevented Schein from entering into the buspirone market and allowed Bristol–Myers to maintain inflated prices on its buspirone products. There is no dispute that these injuries began no later than on or about March 1, 1995, when Schein allegedly failed to introduce generic buspirone into the marketplace. (*See, e.g.,* Ex. 29 ¶ 50; [6] Ex. 31 ¶ 45.)

 The antitrust plaintiffs argue that there is an exception to the four-year statute of limitations for continuing violations, which should be applied to this case. A continuing violation is one in which the plaintiff's interests are repeatedly violated, and, in these circumstances, a new cause of action accrues each time the plaintiff is injured by an act of the defendant. *See, e.g., Bankers Trust Co. v. Rhoades*, 859 F.2d at 1104 (2d Cir.1988) ("In the context of a continuing antitrust violation with continuing injuries, this has usually been understood to mean that each time plaintiff suffers an injury caused by an illegal act of defendants, a cause of action accrues to plaintiff to recover damages based on that injury."). In order to establish a continuing violation, a plaintiff must prove a con-

___

6. All citations to exhibits beginning "Ex." are to the Declaration of Karen R. King dated

Nov. 30, 2001.

tinuing series of overt acts, and, in these circumstances, the statute of limitations runs from the last such overt act. *See Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 406 (6th Cir.1999); *Aurora Enters., Inc. v. NBC, Inc.,* 688 F.2d 689, 694 (9th Cir.1982); *City of El Paso v. Darbyshire Steel Co.,* 575 F.2d 521, 523 (5th Cir.1978). In order to count as such an overt act, the act must be a new and independent act, not merely a reaffirmation of a previous act; and it must inflict new injury on the plaintiff. *See Grand Rapids,* 188 F.3d at 406.

■ In this case, the primary injuries complained of arise out of Schein not entering the market, as it had agreed as part of its Settlement Agreement with Bristol–Myers, which was completed on or about December 2, 1994. While Bristol–Myers allegedly made settlement payments thereafter, such payments are mere consequences of the original Agreement and do not restart the statute of limitations. *Grand Rapids Plastics,* 188 F.3d at 406; *Aurora Enters., Inc. v. NBC, Inc.,* 688 F.2d at 694; *City of El Paso,* 575 F.2d at 523. The antitrust plaintiffs argue that Bristol–Myers's final payment was a further overt act because Bristol–Myers had the option under the Settlement Agreement either to pay the installment or grant Schein a non-exclusive license to market Buspar®. However, Bristol–Myers's option expired on March 1, 1997, under the terms of the Agreement, which was more than four years before any of the present Complaints were filed. *See* Schein–Bristol–Myers Settlement Agreement signed Dec. 4, 1994 to Dec. 13, 1994, at 6, attached as Ex. A to CVS Meridian, Inc.'s First Am. Compl. Even if the exercise of this option was both an overt act and part of a continuing violation, it would not be an instance of conduct lying within the relevant four year statute of limitations period.

Hence, it would not allow for any additional recovery based on the continuing violation doctrine.

The antitrust plaintiffs also allege a different kind of continuing violation, namely, that Bristol–Myers and Schein engaged in a series of acts after the Settlement Agreement was executed and pursuant to its terms to promote the semblance that the '763 Patent was valid, thereby preventing other competitors from entering the buspirone market. However, the '763 Patent is a public document, and any of Bristol–Myers's competitors could have determined independently whether they believed the '763 Patent was valid. The fact that Schein and Bristol–Myers had litigated that very issue, that their dispute was dismissed pursuant to a stipulation and that Schein did not thereafter market any generic form of buspirone would have put a reasonable competitor on heightened notice that there was an issue with regard to this Patent's validity. In these circumstances, the antitrust plaintiffs have not pleaded sufficient facts to suggest how an alleged continuing conspiracy of this sort could have prevented other competitors from entering into the market, if the '763 Patent was in fact invalid.

■ Finally, the antitrust plaintiffs argue that the statute of limitations periods relevant to their antitrust claims should be tolled because Bristol–Myers allegedly fraudulently concealed its agreement with Schein as well as the terms of the Agreement. However, the doctrine of fraudulent concealment applies only "if the plaintiff pleads, with particularity, the following three elements: (1) wrongful concealment by the defendant; (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period; and (3) due diligence in pursuing discovery of the claim." *Butala v. Agashiwala,* 916 F.Supp. 314, 319 (S.D.N.Y.1996); *see also*

*New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir.1988).

In this case, the fact that Bristol–Myers and Schein had been disputing the validity of the '763 Patent was a well-publicized fact, as was the fact that the parties ultimately settled and that Schein did not enter the market. These facts were sufficient to allow any reasonable person in the exercise of due diligence to have surmised that Bristol–Myers and Schein had reached a settlement agreement requiring Schein to stay out of the market. *See Wolf v. Wagner Spray Tech Corp.,* 715 F.Supp. 504, 509 (S.D.N.Y.1989) (noting that in the context of a fraudulent concealment analysis, "facts that should arouse suspicion ... are equated with actual knowledge of the claim" (internal quotation marks omitted)). The fact that the parties had been disputing the validity of the '763 patent and that the district court had initially found the '763 patent invalid were also public and could have been discovered in the exercise of due diligence. Finally, as discussed above, the '763 Patent was itself a public document, and its validity was something that the plaintiffs could have determined for themselves in the exercise of due diligence. Thus, accepting as true the facts pleaded in the relevant antitrust plaintiffs' Complaints, the plaintiffs' claims should not be tolled for fraudulent concealment.

For the foregoing reasons, the claims by the generic competitors arising out of the Schein Settlement activities are barred by the four year statute of limitations. Those claims accrued in March 1995, at the latest, and there was no overt act within the limitation period that restarted the statute. Moreover, there are no facts pleaded on which a claim for fraudulent concealment can be found. With respect to the purchaser plaintiffs, those plaintiffs' claims survive this motion to dismiss to the extent that the claims are based on allegations of injury arising from purchases of Buspar® at allegedly inflated prices beginning four years prior to the filings of their respective Complaints. However, there is no basis to extend the statute of limitations beyond that four year period and allow for recovery based on any prior alleged injuries.

## VI.

Bristol–Myers argues that the antitrust plaintiffs' analogous state law claims arising out of the facts and circumstances surrounding the Schein Agreement should also be dismissed on statute of limitations grounds. The parties have provided supplemental briefs indicating how the relevant statute of limitations provisions work in each of the fifty jurisdictions across the country. This motion is nevertheless premature because, as discussed above, the parties have not yet briefed the prior choice of law question, which will determine which laws govern the respective claims of the different plaintiffs. This motion should thus be dismissed without prejudice to refiling once the class certification issues have been decided.

## CONCLUSION

The Court has considered all of the parties other arguments and finds them to be either moot or without merit. For the foregoing reasons:

1. Bristol–Myers's motion to dismiss on *Noerr–Pennington* grounds the antitrust plaintiffs' federal antitrust and related state law claims arising from Bristol–Myers's listing of the '365 Patent in the Orange Book and filing subsequent patent infringement suits is denied.

2. Bristol–Myers's motion to dismiss on patent immunity grounds the antitrust plaintiffs' federal antitrust and related state law claims arising from Bristol–

Myers's listing of the '365 Patent in the Orange Book and filing subsequent patent infringement suits is denied.

3. Bristol–Myers's motion to dismiss the End–Payor Plaintiffs' state law claims for lack of personal standing is denied, without prejudice to rearguing the relevant issues in the context of the pending class certification motions.

4. Bristol–Myers's motion to dismiss the antitrust plaintiffs' federal antitrust claims arising out of the Schein Settlement activities is (i) granted with regard to the generic competitor plaintiffs and (ii) denied with regard to the purchaser plaintiffs to the extent that they claim damages that accrued within four years of the dates they filed their actions.

5. Bristol–Myers's motion to dismiss the antitrust plaintiffs' state law claims arising out of the Schein Settlement activities on statute of limitations grounds is denied without prejudice as premature.

**SO ORDERED.**