**In re BUSPIRONE PATENT LITIGATION.**

**In re Buspirone Antitrust Litigation.**

**MDL No. 1413.**

United States District Court, S.D. New York.

Aug. 19, 2002.

Michael M. Buchman, J. Douglas Richards, David J. Bershad, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., Robert G. Eisler, Leiff, Cabraser, Heimann & Bernstein, LLP, New York City, Thomas M. Sobol, Hagens, Berman LLP, Boston, MA, for Citizen Action of New York, Consumers for Affordable Health Care, Health Care for All, Inc., Massachusetts Senior Action Council, New York Statewide Senior Action Council, Marcy Altman.

Sharon T. Maier, Ross, Dixon & Bell, L.L.P., San Diego, CA, for Maria Gorelick.

Guido Saveri, Geoffrey C. Rushing, Alexander R. Saveri, Saveri & Saveri, P.C., San Francisco, CA, for Dorothy Wallace.

Joseph J. Tabacco, Jr., Jennifer Sharon Abrams, Berman, DeValerio, Pease & Tabacco, P.C., San Francisco, CA, Stanley M. Grossman, Pomerantz, Haudek, Block, Grossman & Gross, L.L.P., New York City, Lionel Z. Glancy, Michael M. Goldberg, Law Offices of Lionel Z. Glancy, Brian Barry, Law Offices of Brian Barry, Los Angeles, CA, for Lillian Singer.

Joseph R. Saveri, Eric B. Fastiff, Lieff, Cabraser, Heimann & Bernstein, L.L.P., Paul J. Richle, Sedgwick, Detert, Moran & Arnold, San Francisco, CA, for Robert K. Alderman, California Congress of Seniors, Senior Action Network.

Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, CA, for Hillary Weiss.

Jonathan Lee Greenblatt, Shearman & Sterling, Washington, DC, for Watson Laboratories, Inc., Watson Pharma, Inc., Danbury Pharmacal, Inc.

Paul T. Gallagher, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, for HIP Health Plan of Florida, Inc., Robert Levine.

Ira Neil Richards, Trujillo Rodriguez & Richards, Philadelphia, PA, for Robert Levine.

Richard B. Drubel, Boies, Schiller & Flexner, Hanover, NH, for Louisiana Wholesale Drug Company, Inc.

Matthew F. Pawa, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, for Gray Panthers.

David Kevin Lietz, Coale, Cooley, Lietz, McInerny & Broadus, Washington, DC, for Valerie Meyers, Tamera D. Dewitt.

Richard Maxwell Volin, Finkelstein, Thompson, Loughran, Washington, DC, for Norman Seabrook, Israel Rexach, Elias Husamudeen, William Wasnicki, Guy Anderson, Robert Seabrook, Steven Robinson.

Peter L. Thompson, Law Offices of Ronald Coles, Kennebunk, ME, for Marianne Stover.

Lance C. Young, Elwood S. Simon, Elwood S. Simon & Associates, P.C., Birmingham, MI, for Great Lakes Health Plan, Inc.

Allyn Zissel Lite, Joseph J. Depalma, Lite, Depalma, Greenberg & Rivas, L.L.C., Newark, NJ, for Georgia S. Gerstein, Lisa Brooks, Michelle J. Burns.

Richard J. Stark, Evan R. Chesler, Cravath, Swaine & Moore, New York City, Gerald Krovatin, Krovatin & Associates, L.L.P., Newark, NJ, Matthew A. Fischer, Paul J. Riehle, Sedgwick Detert Moran & Arnold, San Francisco, CA, Jeffrey M. White, Pierce, Atwood, Portland, ME, Michael B. Waitzkin, Matthew David Peterson, John D. Kiser, Foxkiser, Washington, DC, for Bristol-Myers Squibb Company.

### Opinion and Order No. 33

KOELTL, District Judge.

(Motion for Interlocutory Appeal of Opinion and Order No. 19)

(Objections to Magistrate Judge's Rulings Regarding Election of Good Faith/Advice-of-Counsel Defense)

(Direct Purchaser Motion for Class Certification)

This case consolidates for pre-trial purposes a number of antitrust actions involving disputes among the various parties over the propriety of the manufacture, use, sale or allegedly anticompetitive conduct related to the use and sale of buspirone, a drug used to treat anxiety. The common defendant or counterclaim defendant in these actions is Bristol–Myers Squibb Company ("Bristol–Myers" or "BMS"), a company that obtained a patent covering the use of buspirone for the treatment of anxiety in 1980 (the " '763 Patent") and that has been selling the product since 1986, when the Food and Drug Administration (the "FDA") approved the drug for human use. The plaintiffs are, variously, generic drug makers who seek or have sought to sell generic buspirone, direct purchasers of buspirone products, end-payors who have purchased buspirone, consumer protection organizations, or their representatives, and a number of States. These plaintiffs (the "antitrust plaintiffs") have consolidated their claims into six Amended Complaints or Pleadings (the "Complaints").

The Complaints assert a number of claims, all of which arise out of two separate sets of circumstances. First, some of the plaintiffs or counterclaim plaintiffs, including the direct purchaser plaintiffs, allege that Bristol–Myers attempted to extend and/or extended an unlawful monopoly over buspirone products for use in the treatment of anxiety, and also entered into a conspiracy to restrain trade in this market, thereby violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, by settling a patent infringement suit with Danbury Pharmacal, Inc. and its affiliate Schein Pharmaceuticals, Inc. ("Schein") in 1994. In that litigation, Bristol–Myers had argued that Schein would infringe the '763 Patent by manufacturing and selling generic buspirone tablets before the '763 Patent expired. The plaintiffs who raise these claims allege that BMS's settlement was a sham used to cover up an unlawful anticompetitive arrangement under which Schein agreed to stay out of the buspirone market and help maintain a public perception that the '763 Patent was valid in return for $72.5 million, even though both parties knew that the '763 Patent was not valid.

Second, all of the Complaints allege that Bristol–Myers attempted to extend and/or

extended an unlawful monopoly over the market in buspirone tablets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by abusing a number of provisions of the Hatch–Waxman Amendments, also known as the Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271(e)), which amended the Federal Food, Drug, and Cosmetic Act ("FDCA"), Pub.L. No. 52–675, 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. §§ 301–397). The antitrust plaintiffs argue that Bristol–Myers thereby prevented the FDA from approving generic buspirone products that competitors sought to market after the '763 Patent expired. The Complaints allege, in particular, that Bristol–Myers (i) listed a newly-obtained patent (the " '365 Patent") in an FDA publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations," or the "Orange Book," on November 21, 2000, less than one day before the '763 Patent expired; (ii) fraudulently represented to the FDA in these listing submissions that the new '365 Patent covered uses of buspirone and that a reasonable claim of patent infringement could be asserted against generic producers of the drug, when Bristol–Myers knew these uses of buspirone clearly would be in the public domain after the '763 Patent expired; and then (iii) immediately brought patent infringement suits against generic competitors who were seeking to enter the buspirone market, thereby triggering an automatic stay of the FDA's approval of these generic products for up to thirty months under the Hatch–Waxman Amendments, specifically, 21 U.S.C. § 355(j)(5)(B)(iii).[1]

There are currently several motions pending before the Court. BMS moves pursuant to 28 U.S.C. § 1292(b) for an order certifying for interlocutory appeal the Court's previous Opinion and Order No. 19, *In re Buspirone Patent/Antitrust Litig.*, 185 F.Supp.2d 363 (S.D.N.Y.2002). This Opinion and Order de-

nied BMS's motion to dismiss a number of the antitrust plaintiffs' claims on *Noerr–Pennington* grounds, while granting in part BMS's motion to dismiss a number of related state law claims on statute of limitations grounds. BMS also objects to a number of discovery rulings that the Magistrate Judge made on June 26, 2002 relating to the timing by which BMS must elect whether it will raise a good faith/advice-of-counsel defense to the antitrust plaintiffs' claims and the potential scope of any waiver of the attorney-client and/or work product privileges that may be associated with such a defense. BMS subsequently filed an Order to Show Cause why its deadline to make this election should not be stayed pending a decision on these objections. Finally, the direct purchaser plaintiff Louisiana Wholesale Drug Company ("Louisiana Wholesale") on behalf of itself and similarly situated direct purchasers of buspirone during certain time periods critical to these actions now moves for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.[2]

## I.

The Court has already set forth a number of the relevant facts in this case in two previous Opinions and Orders, familiarity with which is assumed. *See In re Buspirone Patent/Antitrust Litig.*, 185 F.Supp.2d at 363 (Opinion and Order No. 19); *In re Buspirone Patent/Antitrust Litig.*, 185 F.Supp.2d 340 (S.D.N.Y.2002) (Opinion and Order No. 18).

The antitrust actions in this case were originally consolidated along with a number of patent infringement actions that BMS had brought against its generic competitors, which argued that the generic competitors had infringed the '365 Patent by filing Abbreviated New Drug Applications ("ANDA's") with the FDA for generic buspi-

---

1. The End–Payor plaintiffs, Mylan, Watson and the States raise analogous state law causes of action or counterclaims for antitrust, unfair competition or unfair or deceptive trade practices, and/or unjust enrichment arising out of those same facts and circumstances (the " '365 Patent activities").

2. There is also a class action motion, and related motions, brought by the End–Payor plaintiffs, and a motion by BMS to dismiss various claims of the End–Payer plaintiffs. Those motions have not yet been argued.

rone.[3] In Opinion and Order No. 18, the Court held that the '365 Patent did not cover any method of using of buspirone, and was instead limited to a method of using one of the metabolites of buspirone, and dismissed BMS's patent infringement claims. On the basis of this ruling, which was issued on February 14, 2002, final judgment was entered in favor of Danbury Pharmacal in one of the underlying patent infringement actions, and BMS immediately moved pursuant to Rule 54(b) of the Federal Rules of Civil Procedure for entry of partial judgment on all of the claims of patent infringement in the other patent actions so that these issues could be appealed simultaneously. Finding that "[t]he patent issues are separable from the antitrust issues remaining before this Court and the judgment on the patent claims may be separately enforced," the Court granted this motion on March 15, 2002. Rule 54(b) Judgment of No Infringement dated March 15, 2002, at ¶ 2. BMS timely appealed the judgments entered pursuant to Opinion and Order No. 18 to the Court of Appeals for the Federal Circuit, and that appeal is currently pending.

On February 14, 2002, the Court also issued Opinion and Order No. 19, which held in relevant part that BMS was not entitled to *Noerr–Pennington* immunity for its actions in listing the '365 Patent and bringing its subsequent patent infringement actions so as to invoke an automatic thirty-month stay of the FDA's approval of ANDA's by generic competitors. This ruling did not finally dispose of any of the claims in any of the actions consolidated in this case, and BMS did not move for an interlocutory appeal of the decision at that time.

On April 16, 2002, the plaintiffs filed a motion to compel BMS to elect whether it would raise a good faith/advice-of-counsel defense to the plaintiffs' antitrust claims. The antitrust plaintiffs argued that such a defense would constitute a waiver of some of BMS's attorney client and/or work product privileges, and that the plaintiffs needed reasonable time for discovery into any such is-

sues that might be raised. The plaintiffs had already filed a motion to pierce the attorney-client privilege under the crime-fraud exception to the privilege in light of some of BMS's allegedly fraudulent conduct in this case. On May 24, 2002, while these issues were being disputed, and more than three months after the Court had issued Opinion and Order No. 19, BMS filed a motion for an order certifying Opinion and Order No. 19 for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

On June 26, 2002, the Magistrate Judge ruled that BMS must elect whether it will raise a good faith/advice-of-counsel defense by August 1, 2002. The Magistrate Judge rejected a number of arguments that BMS had made to limit the scope of any waiver that would be associated with such a defense in a number of ways, prior to any assertion of a defense, and indicated that it would decide the motion relating to the crime-fraud exception after BMS made its election. *See* Report and Recommendation dated June 26, 2002, at 14 n. 3. BMS timely filed its present objections.

## II.

■ BMS moves pursuant to 28 U.S.C. § 1292(b) for an order certifying for interlocutory appeal this Court's Opinion and Order No. 19, which was filed on February 14, 2002. The Opinion and Order denied BMS's motion to dismiss the plaintiffs' antitrust and related state law claims on *Noerr–Pennington* grounds.

Section 1292(b) provides that a district court may certify an interlocutory order for appeal if it is of the opinion that (1) the order "involves a controlling question of law"; (2) "as to which there is substantial ground for difference of opinion," and (3) "that an immediate appeal of the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The determination of whether § 1292(b) certification is appropriate under these standards lies within the discretion of the district court. *See, e.g.,*

---

3. These cases were consolidated with another related patent action, which was filed by a generic competitor seeking declaratory relief that its filing of an ANDA would not infringe the '365 Patent. In three of the four original patent actions, BMS's generic competitors raised antitrust claims or counterclaims, which are still being pursued in this case.

*Ferraro v. Sec'y of U.S. Dep't of Health & Human Servs.,* 780 F.Supp. 978, 979 (E.D.N.Y.1992) (collecting cases and citations).

■ Interlocutory appeals under Section 1292(b) are an exception to the general policy against piecemeal appellate review embodied in the final judgment rule, and only "exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); *see also Flor v. Bot Fin. Corp.,* 79 F.3d 281, 284 (2d Cir.1996) (per curiam) (collecting cases). Because piecemeal litigation is generally discouraged, the Court of Appeals has repeatedly emphasized that a district court is to "exercise great care in making a § 1292(b) certification." *Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.,* 964 F.2d 85, 89 (2d Cir.1992); *see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione,* 921 F.2d 21, 25 (2d Cir.1990) (the power to grant interlocutory appeal must be strictly limited to the precise conditions stated in the law). Section 1292(b) was not intended "to open the floodgates to a vast number of appeals from interlocutory orders in ordinary litigation" *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 690 F.Supp. 170, 172 (S.D.N.Y.1987) (internal quotation marks omitted), or to be a "vehicle to provide early review of difficult rulings in hard cases." *German v. Fed. Home Loan Mortgage Corp.,* 896 F.Supp. 1385, 1398 (S.D.N.Y. 1995); *see also Abortion Rights Mobilization, Inc. v. Regan,* 552 F.Supp. 364, 366 (S.D.N.Y.1982); *McCann v. Communications Design Corp.,* 775 F.Supp. 1506, 1534 (D.Conn.1991). Rather, certification is warranted only in "exceptional cases," where early appellate review "might avoid protracted and expensive litigation." *Telectronics,* 690 F.Supp. at 172; *see also German,* 896 F.Supp. at 1398.

■ Finally, the institutional efficiency of the federal court system is among the chief concerns underlying § 1292(b). The efficiency of both the district court and the appellate court are to be considered, and the benefit to the district court of avoiding unnecessary trial time must be weighed against the inefficiency of having the relevant Court of Appeals hear multiple appeals in the same case. *See Harriscom Svenska AB v. Harris Corp.,* 947 F.2d 627, 631 (2d Cir.1991) ("It does not normally advance the interests of sound judicial economy to have piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case, instead of having the trial judge, who sits alone and is intimately familiar with the whole case, revisit a portion of the case if he or she has erred in part and that portion is overturned following the adjudication of the whole case.").

In this case, BMS waited over three months from the issuance of the order in question to file its motion for an interlocutory appeal. The Court had issued two substantial Opinions and Orders on the same day, and BMS immediately sought to appeal Opinion and Order No. 18, while simultaneously foregoing any attempt to appeal Opinion and Order No. 19. BMS has offered no reasonable justification for its delay. BMS also filed its present motion for an interlocutory appeal shortly after the plaintiffs moved to compel BMS to elect whether it would raise a good faith/advice-of-counsel defense, which would require BMS to choose whether to waive the attorney-client and/or work product privilege relating to some materials placed at issue by such a defense. BMS has argued that it should not be forced to make such an election until after an interlocutory appeal of Opinion and Order No. 19 has been decided. In these circumstances, it is difficult, despite BMS's arguments to the contrary, to consider BMS's late motion for an interlocutory appeal as anything other than an attempt to forestall BMS's inevitable need to decide whether it will assert a good faith/advice-of-counsel defense. In any event, the Court would not exercise its discretion to certify an interlocutory appeal in view of BMS's inexcusable or, at best, unexplained delay. BMS's delay effectively prevented the requested interlocutory appeal from being considered at the same time as its appeal from Opinion and Order No. 18, which has already been fully briefed on appeal.

BMS's delay is itself a sufficient ground to deny BMS's motion. *See, e.g., Richardson Elec. v. Panache Broadcasting,* 202 F.3d 957, 958 (7th Cir.2000) ("[A] district judge should not grant an inexcusably dilatory [1292(b) certification] request [relating to a two month delay]."); *Ferraro,* 780 F.Supp. at 979 (rejecting 1292(b) certification motion on the grounds that "there was no justification for plaintiff's [two and a half month] delay" in filing the motion).

BMS has also failed to meet the three prerequisites to certification of an interlocutory appeal. BMS argues for certification based on its contention that Opinion and Order No. 19 allegedly decided a number of issues of first impression, which, BMS argues, a reviewing court might decide differently. In particular, BMS identifies the questions whether listing a patent in the Orange Book is petitioning activity for *Noerr–Pennington* purposes and whether there could be a *Walker Process* exception in the context of listing activity for the intentionally fraudulent listing of a patent.[4]

■ However, the Court of Appeals has held that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Flor,* 79 F.3d at 284 (collecting cases). Rather, "[i]t is the duty of the district judge ... to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." *Id.* (internal quotation marks omitted). In this case, the rulings in question followed from settled principles concerning the nature of activities that are protected for *Noerr–Pennington* purposes, and concerning the scope of the *Walker Process* exception, as applied to the particular facts relating to listing activities, although in a complex regulatory context. The rulings

were also directly supported by the few cases that have directly addressed the issues in question or were most closely on point, *see, e.g., Warner–Lambert Co. v. Purepac Pharmaceuticals, Co.,* No. 99–5948, slip op., at 13 (D.N.J. Dec. 22, 2000) (allowing *Walker Process* exception based on alleged misrepresentation of scope of a patent); *Abbott Labs. Co. v. Alra Lab., Inc.,* No. 92 C 5806, 1993 WL 293995 (N.D.Ill. Aug. 4, 1993) (allowing claim of fraud based on allegation that party knowingly filed false listing with the FDA concerning coverage of a patent); *Litton Systems, Inc. v. AT & T Co.,* 700 F.2d 785 (2d Cir.1983) (filing of tariff was not petitioning activity for *Noerr–Pennington* purposes); *Ticor Title Ins. Co. v. FTC,* 998 F.2d 1129, 1138 (3d Cir.1993) (collective rate filing was not a petition); *City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173, 1181 (8th Cir.1982) (utility rate filing was not a petition), and BMS has cited no cases that directly contradict the Court's rulings or that are more closely on point.

BMS tries to argue that this case is different from others that have been decided, but, in these circumstances, BMS has not provided sufficient substance to its disagreements with this Court's rulings to establish that there is a substantial ground for difference of opinion over the issues decided. *See, e.g., Wausau Bus. Ins. Co. v. Turner Constr. Co.,* 151 F.Supp.2d 488, 491 (S.D.N.Y.2001) ("A mere claim that the district court's ruling was incorrect does not demonstrate a substantial ground for a difference of opinion ....").

BMS also argues that there are substantial grounds for difference of opinion over whether it was objectively baseless for BMS to have claimed that the '365 Patent covers uses of buspirone in its listing of the '365 Patent and its subsequent patent infringement actions. This ruling, however, involved the application of well-settled legal standards for

---

4. BMS also argues that it was an issue of first impression whether a patent claim for a prodrug, which *is naturally metabolized into certain* metabolites in the body, for use in treating anxiety, inherently anticipates a patent claim that is allegedly broad enough to cover any use of that prodrug that is effective in treating anxiety by generating sufficient levels of the metabolite.

However, this issue was not central to the order from which BMS currently seeks an interlocutory appeal, and BMS is already appealing the order that did include a decision of this issue (as part of one of a number of independent grounds for its final conclusions) to the Court of Appeals for the Federal Circuit.

objective baselessness, which are not in dispute among the parties, to the particular positions taken in BMS's patent infringement actions and in its listing activities, given the scope of the '365 Patent. *See, e.g., Decora Inc. v. DW Wallcovering, Inc.,* 901 F.Supp. 161, 165 (S.D.N.Y.1995) (denying interlocutory appeal of opinion that applied "well-settled principles of law to the facts of this case"); *Abortion Rights Mobilization,* 552 F.Supp. at 366 (section 1292(b) is not "appropriate for securing early resolution of disputes concerning whether the trial court properly applied the law to the facts"). BMS disagrees with the Court's conclusions, but BMS has not established the kind of substantial grounds for difference of opinion that would be required for certification of an interlocutory appeal.

■ In any event, BMS has failed to show that the issues of law that it identifies as the basis for this motion are "controlling" in the relevant sense. While "the resolution of an issue need not necessarily terminate an action" in order to fall within the "controlling question of law" prong of 28 U.S.C. § 1292(b), "it is clear that a question of law is 'controlling' if reversal of the district court's order would terminate the action." *Klinghoffer,* 921 F.2d at 24. In this case, a complete reversal could only terminate the plaintiffs claims relating to the listing of the '365 Patent and subsequent patent infringement actions, and the plaintiffs would still be allowed to proceed with their claims relating to BMS's conduct in reaching the Schein Settlement. Moreover, the Court rejected BMS's motion to dismiss based on *Noerr–Pennington* grounds on three independent grounds, each of which would have to be reversed on appeal to terminate the claims relating to BMS's listing activities and its prosecution of the patent infringement actions in their entirety. No one of these issues is "controlling," in the relevant sense, and there is very little likelihood that an interlocutory appeal would materially advance this litigation. *See, e.g. In re Duplan Corp.,* 591 F.2d 139, 148 n. 11 (2d Cir.1978) (while the "controlling question of law" requirement can include procedural determinations that may importantly affect the conduct of an action, courts have tended to make the "controlling question"

requirement one with the requirement that its determination "may materially advance the ultimate termination of the litigation," in these circumstances, and "[t]he critical requirement is that [an interlocutory appeal] have the potential for substantially accelerating the disposition of the litigation").

Indeed, an interlocutory appeal would likely disrupt the advancement of this litigation. The end of discovery is in sight, and it is inevitable that BMS would seek some delay if, as is likely, an appeal was not fully decided by the conclusion of discovery. Moreover, at this point, none of the central claims in the antitrust actions have been decided on the merits, and a decision on the merits in favor of BMS would moot the need for any appeal or at least provide the relevant Court of Appeals with a fuller record on which to examine the merits of any appeal. The Court of Appeals should have the benefit of hearing any appeals in this case with the aid of the full record relating to the parties' claims, and should not have to delve into the complex facts and issues in this case in a piecemeal fashion. *See Able v. United States,* 870 F.Supp. 468, 471 (E.D.N.Y.1994) ("Where the record has not yet developed far enough to permit considered appellate disposition of the claim presented, the case may not be 'ripe' for interlocutory review.") (citing *Paschall v. Kansas City Star Co.,* 605 F.2d 403, 406 (8th Cir.1979)).

BMS argues that an interlocutory appeal would not cause any material delays because such an appeal could be heard in an expedited fashion by the same panel that is currently reviewing BMS's appeal of Opinion and Order No. 18. However, there is no assurance that BMS could obtain an expedited interlocutory appeal from the Court of Appeals for the Federal Circuit, or could have these appeals heard by the same panel. BMS's three-month delay in seeking an interlocutory appeal has helped to assure that any interlocutory appeal would be on a different track from the currently pending appeal.

Moreover, as the parties agreed at oral argument, there are substantial jurisdictional questions concerning where an appeal of

Opinion and Order No. 19 should be heard, given that the underlying actions raise antitrust claims and related state law claims based not only on theories relating to the allegedly improper listing of the '365 Patent and subsequent patent infringement suits but also on theories relating to an alleged agreement in restraint of trade with Schein. *See generally Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809–10, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (a claim "arises under" federal patent law, and lies within the exclusive jurisdiction of the Court of Appeals for the Federal Circuit, only if federal patent law creates the cause of action or if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law in that patent law is a necessary element of one of the well-pleaded claims"); *see also id.* at 810, 108 S.Ct. 2166 ("[A] claim supported by alternative theories in the complaint may not form the basis for . . . jurisdiction [of the Court of Appeals for the Federal Circuit] unless patent law is essential to each of those theories."); *see also In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 166 F.Supp.2d 740, 747–48 (E.D.N.Y.2001) (antitrust claim for allegedly anticompetitive agreement settling patent infringement suit did not arise under federal patent laws); *Altman v. Bayer Corp.*, 125 F.Supp.2d 666, 673–75 (S.D.N.Y.2000) (antitrust claim for which antitrust injury could only be established by establishing invalidity of a patent did not arise under federal patent laws); *cf. generally The Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 122 S.Ct. 1889, 1892–95, 153 L.Ed.2d 13 (2002). The plaintiffs argue that the Court of Appeals for the Second Circuit would have exclusive jurisdiction over any interlocutory appeal in the present circumstances, and the parties have represented that they would continue to dispute these issues on appeal. It is highly unlikely in these circumstances that an interlocutory appeal would materially advance the present litigation.

For all of the above reasons, BMS's motion for certification of an interlocutory appeal is denied.

### III.

BMS raises objections to a number of the Magistrate Judge's rulings dated June 26, 2002 relating to discovery disputes in this case, and, in particular, to the Magistrate Judge's decisions (i) declining to rule that certain broad classes of documents would necessarily fall outside the scope of any waiver that BMS might make by raising a good faith/advice-of-counsel defense in this case, and (ii) requiring BMS to elect by August 1, 2002 whether it would raise any such defense in order to allow the plaintiffs reasonable time for discovery into the facts relating to any such defense. When considering objections to an order issued by a Magistrate Judge concerning nondispositive matters such as these, the Court "shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A); *Thompson v. Keane*, No. 95 Civ. 2442, 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996). An order is "clearly erroneous" only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Surles v. Air France*, 210 F.Supp.2d 501, 502 (S.D.N.Y.2002) (internal quotation marks omitted) (collecting cases). An order is "contrary to law" when it "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Id.* (internal quotation marks omitted). A Magistrate Judge's resolution of discovery disputes deserves substantial deference. *See, e.g., Weiss v. La Suisse*, 161 F.Supp.2d 305, 321 (S.D.N.Y.2001).

### A.

■ BMS's first set of objections, which relate to the Magistrate Judge's refusal to limit the possible scope of any waiver relating to an advice-of-counsel defense that BMS may make to exclude certain broad classes of documents, are overruled. BMS has not even raised any advice-of-counsel defense yet, and the scope of any waiver that BMS may make if it elects to raise such a defense will likely depend at least in part upon the scope and kind of defense that BMS makes, if any, and the kind of discovery that would

be needed to respond fairly to such a defense and test its accuracy. The Magistrate Judge did not rule that any particular documents or any broad classes of documents would necessarily be subject to discovery, as BMS appears to argue, nor has the Magistrate Judge ruled on any actual discovery requests that BMS seeks to challenge. The Magistrate Judge held in main part merely that he could not decide in the abstract that all documents that were uncommunicated to BMS or that were generated after the filing of the complaints in the patent infringement suits, or that may reveal post-complaint "strategy" in the broadest sense, would necessarily be undiscoverable if BMS were to place its reliance on the advice of counsel at issue. *See, e.g.*, Report and Recommendation dated June 26, 2002, at 16–17 & n. 4. BMS has not cited any cases in which courts have been required to rule upon the scope of a possible waiver in this kind of factual vacuum. It is not reasonable to request the kind of blanket clarifications that BMS seeks because the answer to whether certain documents fall within the scope of any waiver will likely depend in part on the kind of advice-of-counsel defense that BMS raises, if any, the particularized documents responsive to any such defense, and/or review, in some instances, of the requested documents themselves within the context of the actual factual disputes that are placed at issue.

BMS argues that if it raises an advice-of-counsel defense it should not be deemed to have waived the relevant attorney-client or work product privileges covering any documents that were not communicated to BMS or that were created after certain critical dates, such as the filing of the patent infringement actions. The Magistrate Judge was sensitive to the fact that "discovery of the undisclosed documents of outside counsel should be limited to matters placed at issue by Bristol–Myers's election of defenses." Report and Recommendation at 17 n. 4. However, the assertion of a good faith/advice-of-counsel defense would by definition place at issue the subject matter whether BMS in fact acted in good faith and in reasonable reliance on the advice of counsel as claimed in its defense, and a number of uncommunicated documents or documents cre-

ated after the patent infringement suits were filed could be relevant to this subject matter. *In re Kidder Peabody Secs. Lit.*, 168 F.R.D. 459, 469 (S.D.N.Y.1996) ("[I]f the privilege holder puts those communications in issue by virtue of his claims or defenses in the case, then a broader, so-called 'subject matter' waiver should ... be recognized.") (internal citations omitted).

It is also clear that BMS cannot in fairness try to tailor an advice-of-counsel defense in an unfairly prejudicial way, so as to provide all the documents relating to the advice of counsel up until a certain arbitrary date, which may tend to support BMS's positions in this litigation, while categorically excluding any such documents thereafter, which may tend to show that BMS thereafter pursued the challenged conduct in bad faith or against the advice of counsel. *Id.* at 469 ("[T]he scope of any waiver by virtue of disclosure was to be defined by the so-called 'fairness doctrine', which 'aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information.") (citing *In re von Bulow*, 828 F.2d 94, 101 (2d Cir.1987); *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486 (3d Cir.1995)) ("There is an inherent risk in permitting the party asserting a defense of its reliance on advice of counsel to define the parameters of the waiver of the attorney-client privilege as to that advice. That party should not be permitted to define selectively the subject matter of the advice of counsel on which it relied in order to limit the scope of the waiver of the attorney-client privilege and therefore the scope of discovery. To do so would undermine the very purpose behind the exception to the attorney-client privilege at issue here—fairness."); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93 Civ. 6876, 1995 WL 598971, at *4 (S.D.N.Y. Oct. 11, 1995).

BMS argues that the subject matter that it would place at issue in raising an advice-of-counsel defense relates only to BMS's state of mind when engaging in the allegedly illicit conduct, and that BMS therefore deserves a ruling that any uncommunicated documents

or documents that were created after the patent infringement suits were filed would not fall within the scope of any waiver of the attorney-client privilege. However, as the Magistrate Judge correctly held, the subject matter that would be placed at issue also includes whether any such reliance was reasonable, a question that can in some circumstances depend on what counsel knew when it rendered its advice. *See, e.g., EEOC v. Rekrem, Inc.,* No. 00 Civ. 7239, 2002 WL 27776, at *2 (S.D.N.Y. Jan. 10, 2002); *Matsushita Elecs. Corp. v. Loral Corp.,* No. 92 Civ. 5461, 1995 WL 527640, at *2 (S.D.N.Y. Sep. 7, 1995).

The Magistrate Judge was also correct that some of the allegedly illicit conduct in this case spanned into the period in which BMS was prosecuting its patent infringement claims, and that some documents from this period would in fairness likely need to be subject to discovery to test any factual assertions BMS might make in raising an advice-of-counsel defense. There are clearly circumstances in which documents that were not communicated to BMS or were created after the patent infringement actions were filed would be relevant to assessing the factual basis for a reliance-on-counsel defense or to placing the disclosures that were made to BMS into an accurate context. The Magistrate Judge correctly identified some of these possible circumstances in the decision, and there was nothing clearly erroneous or contrary to law in the decision.

■ BMS argues that this case is particularly sensitive because, without some assurance that the scope of its waiver would be more limited, the election of an advice-of-counsel defense could allow for the discovery of some documents that would reveal its strategy in these ongoing litigations. It is not yet clear whether there are any genuine grounds for such a concern. Genuine work product is not ordinarily directly relevant to the facts asserted in making an advice-of-counsel defense. The Supreme Court has also recognized, both in *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and again in *United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 45 L.Ed.2d 141, that the work-product doctrine

is distinct from and broader than the attorney-client privilege. The work product doctrine protects documents and mental impressions developed in preparation for litigation in part due to the inequities involved in disclosing such materials to adverse litigants. *In re Six Grand Jury Witnesses,* 979 F.2d 939, 944 (2d Cir.1992). Hence, a party seeking discovery of attorney fact work-product must ordinarily show "substantial need." As for work-product that shows "mental impressions, conclusions, opinions, or legal theories of an attorney," Fed. R. Civ.P. 26(b)(3), the Court of Appeals has held that "at a minimum such material is to be protected unless a highly persuasive showing [of need] is made." *In re Grand Jury Proceedings,* 219 F.3d 175, 190 (2d Cir.2000) (internal quotation marks omitted).

In this case, it cannot be determined whether there is any genuine work product that would be relevant to testing the accuracy of any advice-of-counsel defense that BMS may raise. Those determinations must be made on a particularized basis and not, as BMS attempts to do, by some blanket exclusion. *See generally id.* at 190–92 (analyzing waiver of work product privilege by applying same fairness standards but indicating a preference for particularized findings explaining the relation of the material to the subject matter waived). Given the large amount of discovery that is being produced in this case, there are ways of reviewing and screening documents to help decide some of these sensitive privilege and waiver issues, including the appointment of a Special Master, if BMS were to elect a good faith/advice-of-counsel defense. The parties should raise this issue with the Court or the Magistrate Judge if and when the need arises.

**B.**

■ BMS also argues that the Magistrate Judge erred in requiring it to elect whether it will assert any good faith or reliance-on-counsel defenses in this case by August 1, 2002. At oral argument, the Court stayed this deadline until August 17, 2002 so that the Court could decide BMS's objections to this deadline before the election, and the Court extended the deadline again by a sub-

sequent Order until August 23, 2002 because of the time needed to decide these pending motions. There was nothing clearly erroneous or contrary to law in the Magistrate Judge's initial scheduling deadline, but, given the passage of time, the Court has extended the deadline until August 23, 2002.

The timing and sequence of discovery is a matter over which courts have broad discretion. *See, e.g., Gucci, Inc. v. Exclusive Imports Int'l,* No. 99 Civ. 11490, 2000 WL 1357787, at *3 (S.D.N.Y. Sep. 14, 2000); *Palisi v. Jewelewicz,* No. 96 Civ. 9756, 1997 WL 282218, at *1 (S.D.N.Y. May 27, 1997). In this case, the Magistrate Judge, who had been deciding discovery issues in this case for more than nine months, carefully examined the length of time that discovery had been ongoing, the fact that discovery was then scheduled to terminate in December 2002, the length of time that the parties had possession of the relevant documents, the notice that they had of the various factors relevant to deciding whether to assert an advice-of-counsel defense, including the length of time that BMS had known that the plaintiffs were seeking an election of this defense, and the prejudice that would inure to the plaintiffs without an expeditious election. *See* Report and Recommendation at 11–15. This is also a case in which the Magistrate Judge has reserved judgment on a number of disputes relating to the applicability of the crime-fraud exception to BMS's assertions of attorney-client privilege. These issues may be mooted if BMS raises an advice-of-counsel defense, but, if BMS does not, these issues may also have to be decided with enough time to allow the plaintiffs a reasonable time for discovery into any materials that may be subject to this exception. BMS does not dispute that the plaintiffs are entitled to a reasonable time for discovery on any defenses that BMS will raise, and BMS must clearly elect whether it will raise an advice-of-counsel defense before the close of discovery and in time to allow for such discovery. The Magistrate Judge's deadline was a reasonable one in light of these many factors.

For the foregoing reasons, BMS's objections are overruled.[5]

## IV.

The direct purchaser plaintiff Louisiana Wholesale Drug Company ("Louisiana Wholesale") moves to certify a class consisting of all persons (collectively, the "direct purchasers") who have directly purchased patented buspirone sold under the brand name Buspar ® from BMS at any time during the period beginning on November 9, 1997, in view of the statute of limitations barring prior claims, and ending on March 28, 2001, when Judge Urbina of the District Court for the District of Columbia first issued an injunction allowing generic competitors to begin selling buspirone.[6] The proposed class would exclude federal governmental entities [7] and BMS or any of its officers, directors,

5. BMS originally submitted an Order to Show Cause why its deadline for electing whether to assert a good faith/advice-of-counsel defense should not be stayed pending this Court's resolution of BMS's objections to the Magistrate Judge's rulings. This Order to Show Cause is now moot, and, in any event, was withdrawn with the consent of the parties at oral argument in light of the Court's stay of this deadline until August 17, 2002.

6. Louisiana Wholesale originally sought to certify a class containing any purchasers of Buspar ® from March 1, 1995 through and after the date the motion for class certification was filed until BMS's allegedly illegal conduct ceased. Louisiana Wholesale later took the position that this conduct effectively ceased on February 14, 2002, when this Court issued its Opinion and Order No. 18, finding that the '365 Patent did not cover uses of buspirone. In response to BMS's arguments in opposition to this class certification motion, however, and the Court's separate decision in Opinion and Order No. 19 deciding the relevant statute of limitations for the purchaser plaintiffs' claims, Louisiana Wholesale has agreed to limit the class definition to the time period stated above.

7. Louisiana Wholesale agreed to this limitation in response to BMS's argument in its opposition papers that federal governmental entities must be excluded from the class because they are not considered "persons" under Section 4 of the Clayton Act. BMS also objected to inclusion of any States in the class in view of the separate Complaint by various States, but, as Louisiana Wholesale correctly argues, not all States are plaintiffs, and those that are can choose to opt out of this class.

management and employees, subsidiaries or affiliates.

Before certifying a class, the Court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See, e.g., Marisol A. v. Giuliani,* 126 F.3d 372, 375 (2d Cir.1997); *Comer v. Cisneros,* 37 F.3d 775, 796 (2d Cir.1994); *Dajour B. v. The City of New York,* No. 00 Civ. 2044, 2001 WL 1173504, at *3 (S.D.N.Y. Oct. 3, 2001). The Court must find, more specifically, that:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The Court must also find that the party qualifies under one of the three sets of criteria set forth in Rule 23(b)(1), (2), or (3). *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Comer,* 37 F.3d at 796.

The plaintiff here seeks certification under Rule 23(b)(3), which provides for a class to be maintained where "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3) states that:

> The matters pertinent to the[se required] findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* If the Court finds both that the requirements of 23(a) have been met, and that the claims fall within the scope of Rule 23(b)(3), the Court may, in its discretion, certify the class. *See In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 290 (2d Cir.1992); *Krueger v. New York Telephone Co.,* 163 F.R.D. 433, 438 (S.D.N.Y.1995); *Dajour B.,* 2001 WL 1173504, at *3.

A motion for class certification should not, however, become a mini-trial on the merits. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Krueger,* 163 F.R.D. at 438. The dispositive question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 have been met. *See Eisen,* 417 U.S. at 178, 94 S.Ct. 2140 (citing *Miller v. Mackey Int'l,* 452 F.2d 424, 427 (5th Cir.1971) (Wisdom, J.)). It would be both unwise and unfair to reach the merits of a dispute in this context: resolution of merits issues at this stage might allow some parties seeking certification to secure the benefits of the class action mechanism without first having met its requirements, and might subject some parties to adverse merits rulings without the benefit of the rules and procedural safeguards that traditionally apply in civil trials. *See Eisen,* 417 U.S. at 177–78, 94 S.Ct. 2140. In deciding this motion, the Court should therefore refrain from deciding any material factual disputes between the parties concerning the merits of the claims, *see, e.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 570–72 (2d Cir.1982); *Meyer v. Macmillan Publishing Co.,* 95 F.R.D. 411, 414 (S.D.N.Y.1982), and should accept the underlying allegations from the First Amended Class Action Complaint as true. *See Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978).

At the same time, the Court must conduct a "rigorous analysis" to determine whether the relevant requirements of Rule 23 have been met. *See General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The burden of persuasion lies with the party seeking certification, in this case Louisiana Wholesale. *See, e.g., Bishop v.*

*New York City Dep't of Hous. Preservation and Dev.*, 141 F.R.D. 229, 234 (S.D.N.Y. 1992). In deciding whether the requirements of Rule 23 have been met, the Court may examine not only the pleadings but also the evidentiary record, including any affidavits and results of discovery. *See, e.g., Sirota*, 673 F.2d at 571; *Chateau de Ville Productions v. Tams–Witmark Music Library, Inc.*, 586 F.2d 962, 966 (2d Cir.1978). Hence, the issue on this motion is whether Louisiana Wholesale has met its burden of establishing, on the basis of the pleadings, affidavits, and the results of discovery, that the four prerequisites of Rule 23(a) have been met, and that the proposed class can be maintained under Rule 23(b)(3). *See Dajour B.*, 2001 WL 1173504, at *4; *Krueger*, 163 F.R.D. at 438.

BMS does not seriously dispute that class certification is appropriate for a class consisting of most of the direct purchasers of Buspar®. *See* BMS's Opp. to Direct Purchaser Class Cert. Mot. at 2 n. 2 ("BMS would not oppose certification of a class consisting solely of small wholesalers, such as [Louisiana Wholesale]."). BMS is correct not to do so. The First Amended Class Action Complaint alleges that BMS violated §§ 1 and 2 of the Sherman Act by monopolizing, attempting to monopolize, and illegally conspiring to restrain trade in the market for buspirone by entering into the Schein Settlement Agreement and later listing the '365 Patent and instigating and prosecuting patent infringement actions against generic competitors on the basis of this patent. (*See* First Am. Compl. ¶¶ 110–40.) The plaintiff Louisiana Wholesale contends that these purported violations resulted in an overcharge for buspirone, which thereby injured all of the direct purchasers in the proposed class. (*See* First Am. Compl. ¶¶ 105–08.) The Complaint alleges that the direct purchasers are entitled to treble damages for these overcharges.

With regard to the basic Rule 23(a) requirements, Louisiana Wholesale has presented uncontradicted evidence that its proposed class contains possibly over a hundred members, which is clearly sufficient to meet Rule 23(a)'s numerosity requirement. *See, e.g., Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) (a proposed class with at least forty members raises a presumption that numerosity has been met in this Circuit); *see also Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir.1993).

There are also numerous common questions of fact and law at issue among the members of the proposed class concerning whether BMS engaged in the anticompetitive conduct alleged, the scope of this conduct, and whether this conduct resulted in any overcharges in the market for buspirone. *See, e.g. In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y.1996) ("Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).") (collecting cases); *Jennings Oil Co. v. Mobil Oil Corp.*, 80 F.R.D. 124, 128 (S.D.N.Y.1978) ("The monopolization claims are contingent upon a showing of monopoly power and an examination of the manner in which such power was acquired or maintained. These issues, along with others, are questions that are undoubtedly common to all the members of the putative class.") (internal citations omitted). The common questions of law include whether some or all of this conduct violated either § 1 or § 2 of the Sherman Act. *See generally NASDAQ*, 169 F.R.D. at 510 ("Even to the extent that each member of the class presents a slightly different factual situation, each presents a common legal question.") (internal quotation marks omitted).

The requirement of typicality is also satisfied. Louisiana Wholesale alleges that it was injured in the same general way and by the same general course of conduct that allegedly injured the other members of the class; it asserts liability based on legal theories that are common to the class; and it clearly has adequate individual incentives to prove all of the elements of the causes of action that individual members of the class would bring individually. Louisiana Wholesale's claims are thus typical of most of the other members of the purported class. *See NASDAQ*, 169 F.R.D. at 510–11; *see also In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 554 (S.D.Fla.2001).

With regard to the final requirement, which is the adequacy of representation, class counsel has established that they are qualified, experienced, and generally able to conduct the litigation, and there is no evidence of any conflict of interest between the named plaintiffs and other members of the plaintiff class at this stage. *See In re Drexel Burnham Lambert Group Inc.*, 960 F.2d 285, 291 (2d Cir.1992) (setting forth standards for adequacy of representation). Class counsel has pursued a number of similar antitrust actions, is experienced in this type of litigation and has vigorously pursued the claims before this Court.

For direct purchasers of buspirone seeking to establish violations of §§ 1 or 2 of the Sherman Act on the basis of the conduct alleged in the First Amended Class Action Complaint, common issues of fact and law also clearly predominate over any individual distinctions among the members of the proposed class, thus meeting Rule 23(b)(3)'s requirements for class certification. Proof of the allegedly monopolistic and anti-competitive conduct at the core of the alleged liability is common to the claims of all the plaintiffs. *See generally Amchem*, 521 U.S. at 625, 117 S.Ct. 2231 ("Predominance is a test readily met in certain cases alleging ... violations of the antitrust laws."); *Jennings Oil*, 80 F.R.D. at 130 ("Where an antitrust conspiracy has been at issue, courts have tended to find that common questions predominated despite the existence of individual questions.").

Moreover, with respect to damages, Louisiana Wholesale seeks to establish the overcharges to the class and the antitrust injury using evidence that is applicable to the class as a whole, and this method of relying on generalized proof of class-wide injury has been employed by a number of other courts in almost identical contexts. *See, e.g., In re Terazosin*, 203 F.R.D. at 555–60 (class of direct purchasers certified where generalized evidence of overcharges could be used); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 349–50 (E.D.Mich.2001) (class of indirect purchasers certified in view of reasonable damages methodologies for measuring class-wide damages on an aggregate basis and for

calculating damages for individual class members). The common damage methodology in this case, added to the other common questions of fact and law, demonstrates that common questions of law and fact predominate over any questions affecting only individual members of the class.

The numerous common issues of fact and law and the difficulty of numerous individual lawsuits indicates that a class action is superior to other methods for a fair and efficient adjudication of the controversy. The management difficulties of a direct purchaser class action are not substantial, and indeed BMS has not disputed that some direct purchaser class action is appropriate. Under the circumstances, a class action is the superior method of adjudicating the claims at issue. *See, e.g., In re Terazosin*, 203 F.R.D. at 560–61 (granting class certification for direct purchaser class raising similar overcharge claims for allegedly illicit extensions of patent monopoly); *In re NASDAQ*, 169 F.R.D. at 527–29; *see generally also Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y.1990) ("Since private enforcement of antitrust laws provides a supplement to governmental enforcement, it is our view that class action treatment of alleged antitrust violations is appropriate and desirable.")

BMS argues that this case is nevertheless atypical because three members of the proposed class—McKesson Corp., Amerisource-Bergen Corp. and Cardinal Health, Inc. (collectively, the "Big Three")—allegedly accounted for approximately 90% of the dollar volume of purchases of Buspar® during the relevant time period but were not injured by any of the alleged conduct in this case. In support of this contention, BMS argues that if generic competition had entered into the market at an earlier period, the Big Three would have been able to obtain buspirone at a lower price but would also have lost much of their marketshare in buspirone to many of the numerous smaller wholesalers who are also part of the proposed class, such that their overall profits would have decreased. BMS argues that as a result, the Big Three cannot establish any injury, they lack standing to raise the claims in the

First Amended Class Action Complaint, and these claims are therefore not in common with or typical of any that the other members of the proposed class have against BMS. BMS similarly argues that the common issues of law and fact among the purported classmembers do not predominate over the differences BMS alleges between the Big Three and the other members of the class, and that maintaining this action as a class action is therefore not a superior method of adjudicating these claims.

BMS's arguments fail for several reasons. As an initial matter, there is no question that the Big Three could raise independent claims against BMS alleging that they were injured by paying overcharges relating to the conduct complained of in the First Amended Class Action Complaint. *See, e.g., In re Terazosin,* 203 F.R.D. at 557 (direct purchasers from an alleged conspirator can pursue claim for an overcharge); *see also Illinois Brick Co. v. Illinois,* 431 U.S. 720, 729, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) ("[T]he overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party injured in his business or property ....") (internal quotation marks omitted). Although BMS seeks to offer proof that the Big Three were not in fact actually injured, based on the contention that they did not ultimately lose profits, BMS essentially seeks to establish an affirmative defense to any such claims for damages in the absence of any notice to these proposed classmembers or opportunity for them to be heard. The Court cannot properly decide the merits of any such defenses against the Big Three, and in favor of BMS, on this motion for class certification. Moreover, even assuming that such a defense could be raised, the extent of any actual injuries that the Big Three suffered would depend in part on any overcharges they were forced to pay, and, hence, there would still be common questions of law and fact among the classmembers that predominate in this case. *See, e.g., Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139 (2d Cir.2001); *In re Cardizem,* 200 F.R.D. at 347 ("[T]he presence of individualized defenses, such as mitigation, going only to damages are generally regarded as no barrier to class certification.") (quoting *In* *re Visa Check/MasterMoney Antitrust Litig.,* 192 F.R.D. 68, 86 (E.D.N.Y.2000)). To the extent that there are differences in the particular injuries faced by particular members of the class, these differences are insufficient to defeat a motion for class certification. *See, e.g., In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 382 (S.D.N.Y. 1996); *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 697 (D.Minn.1995). The precise damages faced by individual plaintiffs can be determined individually if and when liability has been established, and, to the extent that the overcharges overstate or understate the appropriate measure of damages for different classmembers, this issue can be addressed by creating subclasses if necessary.

In any event, the evidence that BMS proposes to rely upon presumes a definition of antitrust injury that is inconsistent with the Supreme Court's holding in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe,* the Supreme Court held that except in certain limited circumstances, a direct purchaser suing for treble damages under § 4 of the Clayton Act is "injured" within the meaning of § 4 by the full amount of the overcharge paid by it, and that an antitrust defendant is not permitted to introduce evidence that indirect purchasers ultimately bore some of these costs to show reduced lost profits and thereby reduce the extent of the direct purchasers' compensable injuries. *Id.* at 494, 88 S.Ct. 2224. In *Illinois Brick,* the Supreme Court reiterated this principle, explaining that "[t]he principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties in analyzing price and out-put decisions 'in the real economic world rather than an economists's hypothetical model.'" 431 U.S. at 731–32, 97 S.Ct. 2061 (quoting *Hanover Shoe,* 392 U.S. at 493, 88 S.Ct. 2224).

Much as in *Hanover Shoe,* BMS here seeks to offer proof that any overcharges to the Big Three overstate the actual economic injury they faced due to larger market forces, which mitigated the Big Three's alleged overpayments for Buspar®. BMS contends that due to particularities of the phar-

maceutical market and the methods by which the Big Three sold and distributed pharmaceutical products, BMS's monopoly over buspirone allowed the Big Three to buy and resell a much larger portion of the marketshare of buspirone than would have otherwise been possible, even if the monopoly also resulted in overcharges to the Big Three. In support of this contention, BMS presents expert economic testimony, which applies hypothetical economic modeling to particularities of the pharmaceutical industry market in order to draw conclusions about the individualized overall profit losses that the Big Three faced in relation to other direct purchasers. BMS also offers individualized market data relating to marketshare after the generics entered into the market. To allow for such individualized defenses would require the Court to engage in just the kind of complicated proceedings and reliance on economic modeling and hypotheses for individualized damages calculations that the Supreme Court held to be generally inappropriate in the antitrust context. *See Hanover Shoe,* 392 U.S. at 492–93, 88 S.Ct. 2224.

BMS argues that the defense it raises nevertheless falls within an exception to the *Hanover Shoe* rule. In *Hanover Shoe,* the Supreme Court stated that: "We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present." However, the Supreme Court subsequently explained that:

> [the] Court in *Hanover Shoe* indicated the narrow scope it intended for any exception to its rule barring pass-on defenses by citing, as the only example of a situation where the defense might be permitted, a pre-existing cost-plus contract. In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that

complicates the determination in the general case.

*Illinois Brick,* 431 U.S. at 736, 97 S.Ct. 2061; *see also Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 216, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) ("[T]he possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule" and would result in an "unwarranted and counterproductive exercise to litigate a series of exceptions."). While recognizing that the difficulties and uncertainties involved in determining actual economic injury might be less substantial in the context of some markets than in others, the Supreme Court has rejected a number of "attempts to carve out exceptions to the *Hanover Shoe* rule for particular types of markets," when the attempts reintroduced the need to assess the effects of an overcharge on the purchaser's prices, costs, sales, and profits. *Illinois Brick,* 431 U.S. at 744, 97 S.Ct. 2061; *see also McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 855 (3d Cir.1996) (expressing doubts concerning continuing viability of even the cost-plus exception to *Hanover Shoe* after *UtiliCorp*). There is no evidence that the Big Three had cost-plus contracts that fell within the *Hanover Shoe* exception. Rather, the defense BMS raises would reintroduce the complications that the Supreme Court in *Hanover Shoe* and *Illinois Brick* directed to be avoided. *See also Sports Racing Servs., Inc. v. Sports Car Club, Inc.,* 131 F.3d 874, 885 (10th Cir.1997) (rejecting exception to the *Hanover Shoe* rule when anticompetitive behavior allegedly "redounded to [the plaintiff's] benefit as it similarly protected [the plaintiff] from competition").

Finally, one of the rationales of *Hanover Shoe* was that it would undermine the effectiveness of treble-damage actions to allow the many indirect purchasers, who may have only a tiny stake in the litigation, standing to sue, rather than vesting this standing in direct purchasers, who would have a very real stake in suing if they could obtain the full amount of any alleged overcharges. *See Hanover Shoe,* 392 U.S. at 494, 88 S.Ct. 2224. While BMS correctly argues that the direct purchasers other than the Big Three maintain an active stake in this litigation, it would clearly undermine the effectiveness of treble-

damages actions if companies like BMS could try to evade the bulk of their liability on the basis of defenses like the one BMS seeks to raise here. BMS has not cited any authority in which a court has made an exception to the *Hanover Shoe* rule in circumstances that could effectively shield a purported violator of the antitrust laws from such a large portion of its liability. Moreover, BMS has conspicuously failed to cite any case in which certification of a class of direct purchasers in an antitrust case has been denied because of the possibility of defenses against individual purchasers. Given these facts and the Supreme Court's repeated warnings against allowing for exceptions to the *Hanover Shoe* rule, there is no basis to deny class certification of a direct purchaser class based on BMS's assertion of a theoretical defense to individual members of the class when that defense has not been recognized.

For the foregoing reasons, Louisiana Wholesale's motion for class certification is granted.

### CONCLUSION

For the reasons explained above:

1. BMS's motion for an order certifying Opinion and Order No. 19 for interlocutory appeal is denied.

2. BMS's objections to the Magistrate Judge's rulings dated June 26, 2002 are denied.

3. BMS's Order to Show Cause why its deadline for electing whether it will raise a good faith/advice-of-counsel defense should not be stayed pending this decision has been withdrawn and is now moot. BMS is directed to make such an election by **August 23, 2002**. BMS should produce any documents required to be produced as a result of its election by **September 6, 2002**.

4. Louisiana Wholesale's motion for class certification on behalf of the direct purchaser class is granted. Louisiana Wholesale is directed to submit by **August 30, 2002** a proposed order granting class certification and providing for notice to the class. BMS may respond by **September 6, 2002**.

**SO ORDERED.**